[Civ. No. 13177. Second Dist., Div. Three. Oct. 13, 1942.]

JOHN E. LOWRY, Respondent, v. STANDARD OIL COMPANY OF CALIFORNIA (a Corporation) et al., Appellants.

Reginald I. Bauder for Appellants.

Paul Blackwood and Samuel P. Young for Respondent.

WOOD (Parker), J.—Plaintiff obtained judgment, based upon a verdict, against defendant Standard Oil Company for $10,572 damages for personal injuries resulting from an alleged assault by defendant's employee. Defendant appeals

from the judgment and asserts that the court erred in giving certain instructions and in refusing other instructions requested by defendant.

The complaint alleged that, while plaintiff was a pedestrian upon a public sidewalk adjacent to defendant's service station, an employee of defendant "did wilfully and unlawfully assault" plaintiff with a revolver and ran after him in such a manner that plaintiff was caused to run away, fall and become injured. The answer denied those allegations, and did not include a plea of justification.

Appellant does not claim that the evidence was insufficient to justify the verdict. It is appropriate, however, for a proper understanding of the contentions relative to the instructions, that the substance of the evidence as to liability be stated.

It was stipulated that the employee was acting in the course of his employment by defendant at the time of the injury to plaintiff.

On August 18, 1939, about 10 p. m., a man entered a gasoline service station building of defendant Standard Oil Company at the southwest corner of Beverly and Rampart Boulevards in Los Angeles and in an attempted "holdup" hit the station attendant on the head with a gun. The attendant wrestled with the bandit, took the gun from him and subdued and kept him there until the police arrived. The bandit was convicted of the felony there committed. It was stipulated that a holdup had actually occurred.

Plaintiff testified that he was walking east on the south sidewalk of Beverly Boulevard and was about twenty-five feet west of the service station when his attention was attracted to the station by the breaking of glass in the side of the station building; that he continued walking, then stopped and stood "a very few seconds" on the sidewalk (which was eighteen feet from the station door) in front of the three gasoline pumps, noticed two men in the station, and that "one had the other down on the floor" and was kicking him; that plaintiff said, "Hey, you fellows are going to hurt one another there," and one of them said, "Come on in here"; that he proceeded to walk away and when he had gone ten feet a man came running out of the station chasing plaintiff as fast as he could run; that the man had a .38' or .45 automatic "in his right hand," pointing and clicking it at plaintiff and with his left hand was "pulling it back and working it at the same time" (he testified at three different

times on direct examination that the gun was *clicked* at him. On cross-examination, in his last reference to the gun, he said it was *fired* four or five times at him); that plaintiff ran east on Beverly as fast as he could when he saw the man come out of the station, and he could not say whether or not the man stopped when plaintiff started to run; that plaintiff did not see him after plaintiff started to run; that plaintiff fell "in the street" when he was about half way across Rampart Boulevard, or forty feet from the street corner, fractured his arm about two inches below the shoulder, and injured his shoulder; that he "got up quick" as he could, ran about 1½ blocks, rested a few minutes, then walked to the police station at First and Hill Streets (which was two miles from where he fell and two blocks from where he lived), asked for a doctor, and then several policemen asked him if he was involved in a holdup at Beverly and Rampart (the service station attendant had reported the holdup to the police); that in reply plaintiff related the circumstances above mentioned and in addition said the *"attendant, thinking I was an accomplice,"* came out with a gun; that he was taken to the receiving hospital and the doctor there said, after he had examined him, that there was nothing to worry about and it (the arm) would be all right in two or three days; that plaintiff said he would see his private doctor the next morning, Saturday; that he did not see another doctor until the following Monday morning; that a few days later he entered the Veterans' Hospital; that he did not tell the doctor or anyone, at the time of registering at the hospital or at all, that a car ran through a red sign at Beverly and Rampart and struck him, fracturing his arm and six ribs (the written record of the hospital made at the time plaintiff entered the hospital stated, "The car ran through a red sign and struck him recently fracturing his left arm and six ribs." It was stipulated that the record of the hospital did not include a statement or reference that a man with a gun was chasing plaintiff. Before plaintiff made such answer that he did not say a car ran through a red sign, he was asked thirteen successive times whether he did so state. His purported answers to the questions, prior to his responsive answer, were to the effect that he was in pain, that he told the clerk the same as he had told in court, that he did not understand the question, and that the clerk made the record); that he did tell the clerk who registered him at the hospital that a man with a

gun was chasing him; that he explained to the clerk "about the holdup" and said, "They have a police record," and the clerk said, "We aren't interested in holdups out here . . . was a car involved?" and plaintiff said, "There was cars at this red light and the cars moved off as this light went and it happened about the time I fell in this accident, fell and broke my arm"; that his business, prior to the accident and since 1925, was that he did "bits and parts and extra work in the movies"; that he had no steady work but would work on call; that he averaged about $100 a month during a year; that on the evening of the accident he was returning home from a club, of which he was a member, composed of approximately fifty ex-service men who made their living by working in motion pictures.

The receiving hospital doctor testified that he did not tell plaintiff there was nothing to worry about and that the arm would be all right in two or three days; that he told plaintiff that his shoulder was broken, that it should be set, and that he should take gas; that plaintiff refused to take gas and the doctor did not attempt to set the shoulder, but put his arm in a sling and told him to see a doctor.

The station attendant, Greenlee, testified that he had been employed by the defendant company thirty years and had operated that station six years; that it was eighteen feet from the sidewalk to the station building; that the station was lighted brightly and he was dressed in the regular white uniform; that after the holdup man hit him on the head several times with a gun, Greenlee wrestled with him and knocked the gun from his hand; that glass in the side of the building was broken, he was cut on the head by the glass, and dazed by the blows on his head; that he first saw plaintiff when plaintiff was on the driveway between the pump and the sidewalk, looking in the station, and saying, "Don't hurt him, don't hurt him"; that he believed plaintiff was a participant in the holdup; that Greenlee grabbed the gun which was on the floor, went out the door, and plaintiff was running east on Beverly; that plaintiff fell in the street, got up, and Greenlee did not see him again until the trial; that Greenlee did not leave the station premises, the farthest he was away from the building was eighteen or twenty feet, and he turned back from that point to see about the other man in the station who was then "getting up on his feet"; that he wrestled again with the bandit and put him down on the floor again and kept him there until the police arrived; that he had never

seen plaintiff prior to the holdup; that he did not have any recollection of trying to click or fire the gun; that he did not say, during the wrestle or at all, "Come on in here," and did not hear the bandit say that or anything to that effect.

Plaintiff claims that defendant's failure to plead justification for the alleged assault precludes any attack by defendant upon the trial court's rulings in refusing to give defendant's proposed instructions upon the subject of justification. Defendant contends that the case was tried on the theory that the question of justification was involved and that the issue of justification as a defense was available to defendant even though it was not pleaded. The testimony above set forth and the following references to occurrences at the trial indicate that the case was tried on such theory: In the opening statement in behalf of plaintiff it was said, "And this station man kept pursuing him presumably under the impression that he was in cahoots with the holdup man." It was stipulated at the beginning of the trial and at the close thereof that a holdup had actually occurred. It was agreed that the employee acted in the belief that plaintiff was a participant in the holdup. Plaintiff testified as to his impressions why he was chased and testified as to the essential facts with respect to justification. The employee testified as to the essential facts with respect to justification. No objections were made on behalf of plaintiff to questions by defendant on cross-examination of plaintiff or in examination of the employee concerning essential facts as to justification for the acts of the employee. (A comment was made on behalf of plaintiff, however, to the effect that mistaken identity was not a defense.) Three of the instructions given (hereinafter referred to particularly) related to the question whether there could be justification for the acts of the employee. A proposed instruction was requested by plaintiff to the effect that mistaken identity "is not in itself justification for an assault upon plaintiff." No objections were made by plaintiff to questions asked the employee as follows: "Now, Mr. Greenlee, in the light of what had transpired and the position of the plaintiff there, were you under the impression or belief that he was a participant in this holdup?"; "Was there anything that transpired there that night to cause you, or which did cause you to run after him or threaten him in any way aside from your belief that he was a participant in this holdup which had just taken place?"; "Do

you remember any circumstance that arose at the time that would cause you to run after him excepting your belief that he was a holdup man?"

The facts as to what occurred preceding the injury to plaintiff were practically undisputed. The only points in dispute related to whether one of the men in the service station said, "Come on in here" or words to that effect; whether plaintiff said ". . . you . . . are going to hurt one another," or whether he said, "Don't hurt him"; and whether plaintiff was in the driveway or on the sidewalk. Plaintiff did not see the employee after the employee came out of the door and therefore the distance plaintiff was chased was not in dispute. It appears that the facts in the trial would have been the same if a plea of justification had been included in the answer, as the facts were in the trial without such a plea. In other words, it does not appear that any different issue of fact would have been presented if a plea of justification had been made. A distinction should be noted between this case wherein all the evidence offered by defendant relative to justification was received without objection, and a case wherein defendant sought to introduce evidence of justification and was precluded therefrom because he had not pleaded justification. Plaintiff was not confronted at the trial with an offer of evidence, under defendant's theory of justification, which placed plaintiff at a disadvantage or inconvenience by reason of the absence of a plea of justification. Under the circumstances of this particular case wherein the evidence presented by each party as to the alleged assault was practically the same, it is reasonable to infer, if any objection had been made that any offered evidence was inadmissible because a plea of justification had not been made, that defendant would have sought permission to amend the answer to include such a plea; and it is reasonable to infer that such permission would have been granted. The case was tried upon the theory that justification was an issue and it would have been proper for the jury to find the facts upon that theory. (*Starkweather* v. *Eddy*, (1927) 87 Cal. App. 92, 98 [261 Pac. 763]; *Thomson* v. *Leak*, (1933) 135 Cal. App. 544, 547 [27 P. (2d) 795].)

█ The trial court instructed the jury that: "A person who is not a participant in a holdup or engaged in any unlawful act is entitled to recover damages from an employer whose employee commits an assault upon him while acting in the course of his employment, notwithstanding said employee may

have been reasonably justified under the circumstances in believing that plaintiff was a participant in said holdup."

Although justification was not pleaded, the court undertook, in giving the above instruction at the request of plaintiff, to instruct the jury relative to justification. Respondent states that the instruction does not relate to justification for the assault, but the term "justified" used therein referred only to the employee's belief; that the only issue covered by the instruction was that of mistake in identity; that plaintiff was not a participant in the holdup and therefore it was immaterial that the employee had reason to believe he was a participant. This was not a case of mistaken identity. There was no mistake as to the identity of plaintiff. The employee pursued the only other person present, the one he intended to pursue, the one who expressed concern at the time the uniformed and standing employee was kicking the floored bandit.

The court also gave the two following instructions:

"If you believe that the assault may have been committed by the employee without any unlawful intention, nevertheless his good intention cannot change the assault, which is essentially an unlawful act, into a lawful act."

"No person has the right to assault one who is innocent of wrongdoing. To assault such a person is unlawful."

The three above quoted instructions constituted all of the given instructions relating to justification or probable cause.

Those instructions amounted to a pronouncement that there could be no justification under any circumstances if the plaintiff was not in fact an actual participant in the holdup. In other words, the effect of those instructions was that even though an innocent person at the scene and time of an actual robbery conducts himself in such a manner that the victim of the robbery, as an ordinary reasonable person, would be justified reasonably in believing that such person was a participant in the robbery, the victim would not be justified in attempting then and there, by the use of necessary force, to defend himself or his property, or to apprehend such person who created such impression or belief. Under that instruction a victim of a felony, which is then and there actually being committed in his presence, must, in attempting then and there to defend himself or his property or to apprehend the participants, act only upon *positive* knowledge that a person is in fact a participant who

then and there creates a reasonable belief in the mind of the victim, an ordinary reasonable person, that he is a participant. That instruction unduly restricts a person in the exercise of his right to defend himself or his property, or to apprehend the perpetrator of a felony when as an ordinary reasonable person he has reasonable cause for believing that a person has committed a felony.

The case of *Nakashima* v. *Takase*, (1935) 8 Cal. App. (2d) 35 [46 P. (2d) 1020], was an action for damages for wrongful death. Defendant therein noticed in the daytime that the glass near the lock in the door of his cafe had been cut but not removed. He anticipated that burglary and theft might be committed at the cafe. At night he returned to the cafe with a shotgun and secreted himself in the dark cafe. Soon thereafter the glass in the door was broken and two persons entered the cafe and walked to various places therein. Defendant shot and killed one of them without first giving him a warning or an opportunity to identify himself. The court said at page 38, "The findings of the trial court that the defendant 'was justified in believing that they (Nakashima and his partner) were there in the attempted commission of a felony' and that 'the circumstances . . . were such as to reasonably and properly cause a belief in his (defendant's) mind that the persons in his place of business were attempting a felony . . .' are sufficient in our opinion to justify the shooting and to exonerate defendant from any civil or criminal liability." The court said further, at page 39, "Under such circumstances, defendant had a right as a reasonably prudent person to assume, that if he gave any warning he would have to pay for his charity with his own life or to his great bodily harm."

The standard or rule with reference to the circumstances under which a person may act upon appearances was stated in *People* v. *Albori*, (1929) 97 Cal. App. 537 [275 Pac. 1017]. It was there stated (p. 544) that if a person acts on appearances that he is in imminent danger and believes his apprehension is based on sufficient cause, ". . . he does so at his peril, because the law leaves it to no man to be the exclusive judge of the reasonableness of the appearances upon which he acts, but prescribes a standard of its own, which is not only did the person acting on appearances himself believe that he was in . . . peril . . . but would a reasonable man, situated as defendant was, seeing what he saw, and

knowing what he knew, be justified in believing himself in danger?" A question in this case, therefore, was whether a reasonable man, situated as the employee was, would be justified in acting as the employee did. The court did not give an instruction based upon that standard above stated for the reason, apparently, that it considered justification was not a defense if plaintiff was innocent.

Section 837 of the Penal Code provides: "A private person may arrest another: . . . 3. When a felony has been in fact committed, and he has reasonable cause for believing the person arrested to have committed it."

■ It was not a requirement under the circumstances here presented, as plaintiff contends it was, that the employee should have announced preliminarily to his pursuit of plaintiff that his intention was to arrest or apprehend him. (Pen. Code, § 841.) That section provides: "The person making the arrest must inform the person to be arrested of the intention to arrest him, of the cause of the arrest, . . . except when the person . . . is pursued immediately after its commission. . . ." The employee pursued him immediately, but did not go more than twenty feet and at no time during the pursuit was within twenty feet of plaintiff. When plaintiff fell, the employee was more than forty feet away. Notice of intention to make an arrest may be indicated from the circumstances and it is not necessarily a requirement that notice of such intention be given by express statement before taking the person into actual or potential custody. (*Allen* v. *McCoy*, (1933) 135 Cal. App. 500, 509 [27 P. (2d) 423].) The intention of the employee in pursuing him may be determined from all the surrounding circumstances. Immediately before pursuing plaintiff he had apprehended and subdued the bandit. Later developments revealed that he subdued the bandit again and kept him until the police came and arrested him.

The case of *Allen* v. *McCoy, supra,* was a false imprisonment action. Defendant, a sheriff, arrested plaintiff without a warrant for a crime not committed in defendant's presence. Defendant had been notified that two men and a woman, who had committed a felony, were fleeing in an automobile from pursuing officers; that the automobile had overturned in an attempt to turn into an unfrequented side road; and that the fugitives had escaped in the adjacent timber and brush. The woman lost a shoe at the wrecked automobile.

Defendant, several officers and other men searched for several hours for the fugitives. They found, among other clues, footprints of two men and a woman with only one shoe in a nearby dirt road. They followed the tracks to a gate near an old abandoned cabin. The posse approached the cabin. Plaintiff, a stranger in the community, who had been occupying the cabin a few days, opened the door, then closed it and stayed inside. Defendant shot into the building three times, then plaintiff came out and defendant put handcuffs on him. After a few minutes of investigation, plaintiff was released by defendant with an apology. The court said at page 507, "An officer is not liable for false imprisonment for the arrest without a warrant of a person who he has reasonable grounds to believe is guilty of a crime. The question of the existence of probable cause to believe that one is guilty of a crime must be determined as a matter of law from the facts and circumstances of the case."

In *Collyer* v. *S. H. Kress & Co.*, (1936) 5 Cal. (2d) 175 [54 P. (2d) 20], plaintiff was apprehended, as he was leaving defendant's store, by one of defendant's detectives who claimed he saw plaintiff steal articles in the store. The detective escorted plaintiff back into the store and detained him for about twenty minutes for the purpose of investigation, then he was arrested by the police and charged with petty theft. Later a jury found him not guilty. The action was for damages for false imprisonment. The only question involved was whether defendant had the right to detain plaintiff for the purpose of investigation. The court said at page 180: "Ordinarily, the owner of property, in the exercise of his inherent right to protect the same, is justified in restraining another who seeks to interfere with or injure it. . . . However, there seems to exist considerable confusion in the cases as to whether probable cause is a defense in false imprisonment cases involving misdemeanors. The broad statement occasionally appears to the effect that probable cause is no defense in actions for false imprisonment. . . . [citing cases] The cited cases involved unlawful arrests under the authority of illegal process issued in civil actions. In such instances, . . . it is obvious that probable cause is not pertinent to any issue in the case. . . . However, those authorities which hold, where a person has reasonable grounds to believe that another is stealing his property, as distinguished from those where the offense has been completed, that he is justi-

fied in detaining the suspect for a reasonable length of time for the purpose of investigation in a reasonable manner. . . . [citing cases] must necessarily proceed upon the theory that probable cause is a defense. And this is the law because the right to protect one's property from injury has intervened. In an effort to harmonize the individual right to liberty with a reasonable protection to the person or property of the defendant, it should be said in such a charge of false imprisonment, where a defendant had probable cause to believe that the plaintiff was about to injure defendant in his person or property, even though such injury would constitute but a misdemeanor, that probable cause is a defense provided, of course, that the detention was reasonable. . . . And, of course, we may properly refer to probable cause as a defense in false imprisonment cases as constituting that justification for the arrest which may be announced by statutory enactment. With the foregoing explanation, the authorities are harmonized and it is made clear that probable cause is a justification for the detention of the plaintiff in the instant cause." (See *Bettolo* v. *Safeway Stores, Inc.,* (1936) 11 Cal. App. (2d) 430 [54 P. (2d) 24] ; and *Driscoll* v. *Shipp,* (1937) 21 Cal. App. (2d) 369 [69 P. (2d) 429].)

Although the case now before the court was not a false imprisonment action and the plaintiff was not apprehended, as the plaintiffs were in the *Allen* and *Collyer* cases, *supra;* nevertheless, the rule stated in those cases, that probable cause was a defense in an action wherein a person was actually apprehended, should apply in the present case wherein the conduct of the pursuing employee, if it was his intention to apprehend plaintiff, amounted only to an attempt to apprehend as distinguished from actual apprehension. In the present case it was a question of fact to be determined by the jury, under proper instructions, whether the state of mind of the employee in pursuing the plaintiff was that of attempting the apprehension and holding of him until the police arrived.

Plaintiff asserts that the theory of attempted arrest was not a theory upon which the case was tried and that defendant may not urge such a theory for the first time upon appeal. The specific statement that the employee attempted to arrest the plaintiff was not made at the trial. It was agreed that the employee acted in the belief that plaintiff was a participant in the holdup. A proposed instruction by defendant

(but not given) was in substance that should the jury believe that the circumstances surrounding plaintiff's presence at the service station were such as to justify the belief by Greenlee that plaintiff was a participant in the robbery, and that the conduct of Greenlee "was incident with such belief," then Greenlee was not guilty of an assault.

One of the most obvious things included in conduct "incident with such belief," that is, belief that plaintiff was a participant in a robbery then and there being committed, would be an attempt to apprehend plaintiff and hold him for the police, as Greenlee had done just previously in treating with the bandit under similar but more aggravated circumstances. Under such circumstances, particularly when the defense was justification and the court gave an instruction which excluded all theories of justification as a defense, if the plaintiff was innocent, it should not be concluded that an attempt to apprehend or arrest plaintiff is a new theory of justification presented first on appeal.

Two other special instructions requested by defendant, and refused, related to justification and were to the effect that if the conduct of Greenlee under the circumstances was such as might reasonably be expected, or was reasonably justified, Greenlee was not guilty of assault. Another special instruction so requested was to the effect that the mere fact that plaintiff was without fault would not make the conduct of Greenlee actionable. Plaintiff states that such instructions were erroneous because they did not state what constituted justifiable assault.

It will not be necessary, by reason of the disposition of this appeal on other points, to rule upon the sufficiency of those instructions.

The instructions heretofore quoted, and which were given, to the effect that justification was not a defense if plaintiff was innocent, were erroneous prejudicially. It is reasonable to conclude that if those instructions had not been given and proper instructions had been given, a different result at the trial would have been probable.

The judgment is reversed.

Schauer, P. J., and Shinn, J., concurred.

Repondent's petition for a hearing by the Supreme Court was denied December 8, 1942. Curtis, J., and Carter, J., voted for a hearing. Traynor, J., did not participate therein.